# 24-2519

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

ALEXANDRA KOENIGSBERG, MAXWELL KOENIGSBERG, and OLGA STAMBLER,
Individually and on Behalf of All Others Similarly Situated,

*Plaintiffs-Appellants,*

v.

THE BOARD OF TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF
NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

Case No. 1:23-cv-01044-PPG, Hon. Paul G. Gardephe, Judge Presiding

**BRIEF OF PLAINTIFFS-APPELLANTS**

Matthew T. Heffner
Matthew T. Hurst
HEFFNER HURST
*Counsel for Plaintiffs-Appellants*
30 N. LaSalle Street, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466

November 8, 2024

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE ..............................................................2

    A. Factual Background...............................................................2

    B.  The Initial Complaint and its Dismissal................................7

    C. Plaintiffs' Motion to Vacate or Amend.................................8

    D. Denial of the Motion to Vacate or Amend.........................13

STANDARD OF REVIEW ................................................................15

SUMMARY OF THE ARGUMENT....................................................15

ARGUMENT...................................................................................18

  I.  Plaintiffs' Proposed Amended Complaint Adequately Alleges
     Facts Supporting Equitable Tolling Under New York Law.................18

    A.The Standard for Equitable Tolling Under New York Law.............18

    B.  Plaintiffs Adequately Allege Columbia's Annual
      Misrepresentations to USNWR Were Affirmative Steps That
      Concealed Their Past Conduct .........................................19

    C. Plaintiffs Adequately Alleged That Columbia's Conduct Was
      Self-Concealing by Nature ...............................................21

    D.  Plaintiffs Exercised Reasonable Diligence in Discovering
      Their Claims ...................................................................24

E.  Plaintiffs Filed Their Claim Within a Reasonable Time After the
    Discovery of Their Claims....................................................................29

II. Plaintiffs' Unjust Enrichment Claim Was Not Futile Because Its
    Damage Theory Is Not Identical to the GBL Claims............................31

CONCLUSION ........................................................................................33

# TABLE OF AUTHORITIES

*Abbas v. Dixon*,
  480 F.3d 636 (2d Cir. 2007) ...................................................................31

*Abercrombie v. Andrew Coll.*,
  438 F. Supp. 2d 243 (S.D.N.Y. 2006) .......................................................19

*Alli-Balogun v. United States*,
  281 F.3d 362 (2d Cir. 2002) ...................................................................30

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ...................................................................27

*Haekal v. Refco, Inc.*,
  198 F.3d 37 (2d Cir. 1999) ...................................................................30

*Harper v. Ercole*,
  648 F.3d 132 (2d Cir. 2011) ...................................................................30

*In re Commodity Exch., Inc.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) .......................................................21

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ...................................................................15

*Liu v. Intercept Pharms., Inc.*,
  No. 20-3488, 2022 WL 2165621 (2d Cir. June 16, 2022) ..........................15

*Miller v. Int'l Tel. & Tel. Corp.*,
  755 F.2d 20 (2d Cir. 1985) ...............................................................25, 26

*Nine West Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000) .......................................................18

*Olivieri v. Stifel, Nicolaus & Co., Inc.*,
  112 F.4th 74 (2d Cir. 2024) ...................................................................29

*Olson v. Major League Baseball,*
     29 F.4th 59 (2d Cir. 2022)............................................................15

*Pearl v. City of Long Beach,*
     296 F.3d 76 (2d Cir. 2002) ....................................................25, 26

*Reynolds v. Lifewatch, Inc.,*
     136 F. Supp. 3d 503 (S.D.N.Y. 2015).........................................31

*Sec. & Exch. Comm'n v. Rashid,*
     96 F.4th 233 (2d Cir. 2024)........................................................27

*State of N.Y. v. Hendrickson Bros.,*
     840 F.2d 1065 (2d Cir. 1988)......................................................21

*Valdez ex rel. Donely v. United States,*
     518 F.3d 173 (2d Cir. 2008)........................................................29

*Veltri v. Bldg. Serv. 32B-J Pension Fund,*
     393 F.3d 318 (2d Cir. 2004) .......................................................18

*Vincent v. Money Store,*
     304 F.R.D. 446 (S.D.N.Y. 2015).................................................18

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The district court entered judgment dismissing the action on March 25, 2024. On April 22, 2024, Plaintiffs filed a Motion to Vacate or Amend Judgment under Rules 59(e) and 60(b)(6). It was denied on August 20, 2024. Under F.R.A.P. 4(a)(4), Plaintiffs-Appellants timely filed their notice of appeal on September 18, 2024. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the trial court err in finding Plaintiffs' Amended Complaint futile because Plaintiffs' claims for misrepresentation under New York General Business Law §§ 349 and 350 were time barred because the doctrine of equitable tolling did not apply?

2.      Did the trial court err in finding Plaintiff's Amended Complaint futile because Plaintiffs' unjust enrichment because it found that claim sought the same damage theory as Plaintiffs' General Business Law claims?

## STATEMENT OF THE CASE

### A. Factual Background

Although Columbia has a reputation as one of the most prestigious universities in the world, JA057 at ¶ 9, the rise of objective ranking—and their importance to prospective students—required it to compete more vigorously against its peers. *Id*. at ¶¶ 10-12. The most well-known ranking is the U.S. News & World Report in its annual survey of Best American Universities ("USNWR"). *Id*. at ¶ 12. USNWR's rankings are so influential that a one-rank improvement in the rankings results in a nearly 1% rise in applicants the following year. *Id*. The rankings are based on self-reporting of 17 factors, ranging from graduation and retention rates to class size. *Id*. at ¶ 13.

Columbia, like other institutions, understands how the USNWR rankings are computed and the importance of those rankings. JA058 at ¶ 14. With increased rank comes additional applications and application fees. *Id*. at ¶¶ 15-16. Indeed, Columbia used its USNWR ranking to recruit applicants. *Id*. at ¶ 17. Schools with low acceptance rates, like Columbia, know that they are a "reach" school for many applicants. *Id*. at ¶ 18. The

cost of applying—$85—limits the number of reach schools that prospective students apply to because there is an extremely low chance of admission. *Id.*; JA064 at ¶¶ 45-46.

The USNWR ratings were not always kind to Columbia; in 1988 it was ranked 18th and bounced between the top ten and lower teens in the 1990s. JA059 at ¶ 19. Thereafter, Columbia experienced a meteoric rise when it was ranked 4th in 2010 and ultimately the prestigious rank of the second-best undergraduate program in the county in 2021. *Id.*; JA062 at ¶ 34. This rise resulted in a tripling of applications and a 75% reduction in acceptance rates. JA064 at ¶ 46.

But Columbia's rise was not the result of improvements to education or student life, but because in 2010 Columbia began to report false or misleading data to USNWR. JA059 at ¶ 19-20. It did this in seven ways:

- First, Columbia claimed that over or around 80% of its undergraduates attended classes with fewer than 20 students. The true number was actually around 57%. JA059-60 at ¶ 23-24.

- Second, Columbia reported 100% of its full-time faculty had with Ph.D. or terminal degrees in their field. Instead, the true percentage was only 95%. JA060 at ¶ 27.

- Third, Columbia reported that 96.5% of its non-medical faculty were full-time. In reality, the percentage of actual full-time faculty is close to 50%. *Id*. at ¶ 28.

- Fourth, Columbia reported its student-faculty ratio as 6 to 1. The true number is between 11 to 1 and 8 to 1. JA061 at ¶ 29.

- Fifth, Columbia reported false and misleading data regarding the annual amount of money spent on instruction per student. For example, in 2019-2020, it reported spending was slightly over $3.1 billion, or over $100,000 annually per student. The real number is at least a billion dollars less, as can be seen in Columbia's year-end consolidated financial statements. *Id*. at ¶ 30.

- Sixth, Columbia claimed that that it spent over $1 billion annually on research, despite the fact that its government reporting shows spending of only $763 million, and its consolidated financial statements show even less--$660 million. *Id*. at ¶ 31.

- Seventh, Columbia failed to include transfer students in reporting data regarding its student outcomes. The outcomes for these students, who make up an inordinately high percentage of students at Columbia compared to other top 25 or 50 universities, are worse than traditional applications. Had Columbia disclosed this context for its student outcome data, Columbia's reported numbers would have been much less impressive. *Id*. at ¶ 32.

Had Columbia reported its actual data to U.S. News, it would not have ranked in the top 5 or even top 10 U.S. national universities. JA062 at ¶ 35.

The manipulation had a direct effect on applications and acceptance rates. In the last year before Columbia began manipulating the data for rankings, the overall acceptance rate was 12.4% on 18,120 applications. JA064 at ¶ 46. As the manipulation of the rankings continued, the number of applications and the acceptance rate would follow nearly straight lines. Only a few years later, applications increased to 22,585 while the acceptance rate decreased to 10.7%. *Id.* A mere five years after that, applications increased again to 33,531 while acceptance rates nose-dived to 6.9%. *Id*. This continued right up to the point the manipulation was uncovered, when applications had further surged to 60,551 with an acceptance rate of only 3.7%. *Id.*

In early 2022, Professor Michael Thaddeus, a mathematics professor at Columbia, published an article revealing the false and misleading data and how Columbia used that false and misleading data to manipulate its rankings within the US News rankings. JA062 at ¶ 36. In September 2022, Provost Mary Boyce admitted that at least two findings of the report, class size and instructors with terminal degrees, were misrepresented to

5

USNWR. JA062-63 at ¶¶ 37-39. Columbia did not address the other five areas of misreporting in the Thaddeus report. JA063 at ¶ 40.

Both Plaintiffs Koenigsberg applied to Columbia University undergraduate in the fall of 2018. JA065 at ¶ 49. Neither plaintiff would have applied for admission to Columbia had they known the truth about Columbia's data and what should have been its real ranking in the U.S News service. *Id.*

Defendant and its operations are located in New York. JA056 at ¶¶ 4 & 7. All of the wrongful conduct alleged took place in New York, including all of the transactions at issue here between the Plaintiffs and Defendant and all the misleading statements emanated from New York. *Id.* at ¶¶ 6-7. On information and belief, all of the false and/or misleading data was generated in, and transmitted from, Columbia's campus in New York City. JA062 at ¶ 33. Columbia solicited applications from students across the world via its website and its college brochures and applications. JA065 at ¶ 47. All of these materials were developed in and originated from New York. *Id.* Columbia solicited and received all of the application fees in New York. *Id.* at ¶ 48.

## B. The Initial Complaint and its Dismissal

In February 2023, Plaintiffs brought suit against Columbia under New York's General Business Law ("GBL") and for unjust enrichment. Defendant moved to dismiss. Dkt. 25. The district court granted Defendant's Rule 12(b)(6) motion on the GBL claims on two grounds: (1) statute of limitations, and (2) Plaintiffs' failed to plead damages separate and apart from the payment of the entire application fee. JA025-50

Plaintiffs paid the application fee to Columbia in the Fall of 2018, but did not file until February 2023. JA038. GBL claims, like Plaintiffs, have a three-year statute of limitations. *Id*. Plaintiffs contended that accrual was tolled during the period that the manipulation was ongoing but undiscovered. *Id*. The district court rejected any equitable tolling because it "does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiffs underlying cause of action." JA039. It held that because "Columbia's misrepresentations to U.S. News provides the basis for both Plaintiffs' GBL cause of action and their equitable tolling claim," equitable tolling did not apply and Plaintiffs' GBL claims are time-barred. JA040.

Despite finding the claims time barred, the court continued further to find that - even if Plaintiffs' GBL claims had been timely filed, Plaintiffs have not "present[ed] a legally cognizable [GBL] injury," because they improperly "set[] forth deception as both act and injury." JA042. It did not consider a theory of "price premium" because "[t]his theory of injury [wa]s ... not pled in the Complaint and therefore may not be considered in resolving Columbia's motion to dismiss." JA045.

Finally, turning to the unjust enrichment claim, the court found it was duplicative of the GBL claim, even though it had just dismissed the GBL claims. JA048. It rejected Plaintiffs' arguments that the elements of an unjust enrichment claim are different from a GBL claim. *Id.* The court ordered the clerk to enter judgment for Defendant, which the clerk did on March 25, 2024, terminating the case. JA050-51.

## C. Plaintiffs' Motion to Vacate or Amend

Plaintiffs sought to file an Amended Complaint. Because the district court dismissed the case with prejudice, following guidance from this Court, Plaintiffs filed a Motion to Modify or Vacate the Judgment. JA052-54. A proposed Amended Complaint, containing additional allegations,

was attached to the memorandum. A redline was also attached to illustrate the modifications. JA055-97. JA098-119. The changes in the proposed Amended Complaint sought to address the two areas of concern raised by the trial court in its decision.

First, the proposed Amended Complaint contained a supplemental damages theory that Columbia received a price premium as a result of the manipulation. Colleges ranked in the top ten charge, on average, charge almost $11 more to apply than colleges ranked between 11th and 20th. JA063 at ¶ 41. By manipulating its way into the top ten, Columbia was able to charge a price premium in excess of what it would have been able to charge as a second decade ranked school. *Id*. at ¶ 42. Plaintiffs would not have paid this price premium had they been aware of the manipulation of the USNWR rankings. JA065 at ¶ 49.

Second, it contained numerous additional allegations that Defendant's manipulation would have been impossible for any normal person to discover. The additional allegations, in part, focused on the rarefied talents of Professor Thaddeus, who uncovered Defendant's manipulation. This included his degrees from Harvard and Oxford, as well as his post-graduate work at both the Mittag-Leffler Institute and the

9

Simons Laufer Mathematical Sciences Institute. JA067 at ¶ 63. He was also a member of the School of Mathematics at Institute for Advanced Study, which was the academic home of many intellectual giants including Albert Einstein, J. Robert Oppenheimer, and John von Neumann. *Id*. In addition to his academic credentials, he is a tenured professor at Columbia with institution-specific knowledge of the resources necessary to identify the manipulation. *Id*. at ¶ 63; JA068 at ¶ 67; JA069 at ¶¶ 69 & 72.

In addition, the allegations detailed some of the work Professor Thaddeus had to undertake to identify the false data. Columbia, unlike most universities, did not participate in the Common Data Set, JA059 at ¶ 21 & JA068 at ¶ 66, which was "highly unusual for a university of its stature." JA078. The Common Data Set was established "to improve the quality and accuracy of information provided to all involved in a student's transition into higher education" by "the development of clear, standard data items and definitions." JA059 at ¶ 21. Columbia's non-participation made it difficult, not only for an ordinary person to determine the veracity of the information it provided to USNWR, JA068 at ¶ 66, but for Professor Thaddeus as well. JA078-81.

Professor Thaddeus was familiar with criteria USNWR used to rank colleges, had institutional knowledge of various sources of data within Columbia, was familiar with data reported to various governmental agencies, and was able parse the data and run the various mathematical formulas. JA068-69 at ¶¶ 67-70; JA078-88. To that end, the proposed Amended Complaint gave specific descriptions of what was involved, such as:

- Class size: Professor Thaddeus, from his tenure at Columbia, knew Columbia published an online Directory of Classes which showed class enrollment. JA068 at ¶ 67. Even then, he had to utilize a third-party website, that maintains a historical cache of websites, to obtain prior years of the Directory. *Id*. After that, he had to parse graduate from undergraduate classes. *Id*. Even after all that, he still admitted there was "genuine uncertainty" about the correct class size. *Id*.

- Faculty with Terminal Degrees: Professor Thaddeus waded through the 958 faculty to determine the percentage with terminal degrees in their fields. JA068 at ¶ 68. But even to him, it was unclear who should be included in the calculations. *Id*.

- Full-time Faculty: Professor Thaddeus he found data from 2020 (two years after Plaintiffs applied) from the National Center for Education Statistics. JA069 at ¶ 69. From there, following the USNWR criteria, he needed to eliminate the medical faculty from the full-time faculty calculation. *Id*. Professor Thaddeus found it "puzzling" and had "insufficient" information to explain the massive discrepancy between the part-time faculty reported to USNWR (173) and that reported to the government (1,662). JA081-82.

- Instructional Spending: Columbia claimed to the government that its instructional spending was $3.1 billion, a proxy for the financial resources per student factor used by USNWR. JA069 at ¶ 70. Professor Thaddeus compared the reports to the government with Columbia's own financial statements. *Id*. By doing so, he uncovered that Columbia was claiming that over $1.2 billion in "Patient care expense" was improperly being claimed as "instructional" for USNWR purposes. *Id*.

In contrast to Professor Thaddeus' background and institutional knowledge, Plaintiffs were two high school students who had yet to earn their high school diplomas. JA068 at ¶ 64. They did not figure out Columbia's manipulation, JA069 at ¶ 72, nor did tens of thousands of other applicants and their parents. *Id.* at ¶ 72. But perhaps most importantly, neither did USNWR. *Id*. at ¶ 71. Even Columbia's competitors, the colleges and universities that would benefit from exposing Columbia's false data, did not uncover the manipulation. JA070 at ¶ 73. That's because secrecy was essential to manipulation. JA067 at ¶ 60; JA068 at ¶ 65. Once it was uncovered, the manipulation wouldn't work and Columbia would drop in the rankings. JA067 at ¶ 60. And that's exactly what occurred when Professor Thaddeus published his findings. *Id*. at ¶ 61.

Finally, the Amended Complaint retained the unjust enrichment claim with the same damage theory since it was now different than the price-premium GBL damage theory. JA074 at ¶¶105-111.

### D. Denial of the Motion to Vacate or Amend

The district court denied Plaintiffs' Motion to Vacate or Amend, finding that the amendments would be futile because the action was barred by the three-year statute of limitations. JA129. It held that equitable tolling of the limitations period does not apply when misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiffs underlying cause of action. *Id*. The court further held that exceptional circumstances did not exist because Professor Thaddeus' analysis was based, in part, on publicly available information. JA130. It reiterated that equitable tolling only applies when it is "<u>impossible</u> for a reasonably prudent person to learn about his or her cause of action." JA131. (emphasis in original, quotation omitted). It found that Columbia's actions were not self-concealing. *Id*.

The court also concluded that even if the limitations period was tolled, it would not help Plaintiffs. JA132. It believed that Plaintiffs'

complaint, filed 11 months after the public disclosure of the rankings manipulation, was not brought within "a reasonable period of time" after learning of their right to sue. JA135. As such, it denied the motion because the amendment would be "futile." JA135-36.

Finally, the Court found Plaintiffs' unjust enrichment claim to be duplicative of the GBL claims, despite the new damage theory pled in the Amended Complaint. JA 124.

Plaintiffs filed their notice of appeal on September 18, 2024. JA137-39.

## STANDARD OF REVIEW

Denial of a post-judgment motion for leave to amend under Rule 59 or 60 on the basis of futility is reviewed *de novo*. *Olson v. Major League Baseball*, 29 F.4th 59, 72 (2d Cir. 2022)(internal citations omitted)). *See also Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 92 (2d Cir. 2016); *Liu v. Intercept Pharms., Inc.*, No. 20-3488, 2022 WL 2165621, at *2 (2d Cir. June 16, 2022).

## SUMMARY OF THE ARGUMENT

Plaintiffs proposed Amended Complaint adequately pled facts to support a claim under New York law for violations of the GBL and unjust enrichment and those claims were not time-barred. Plaintiffs filed their complaint within 11 months of reasonably discovering they might have been injured and within just a few months of Columbia admitting their misdeeds.

The facts pled sufficiently support a finding at this stage of the litigation that the statute of limitations for Plaintiffs' GBL claims was tolled. Plaintiffs allege that Columbia took affirmative steps to conceal its misconduct by submitting false data to USNWR each and every year after

their misrepresentations in 2018 that caused Plaintiffs to apply to Columbia. Those false submissions led to continued false rankings for Columbia, and covered the fact that they had submitted false data in the past. The trial court erred by lumping all of Columbia's misrepresentations into one "act" that Plaintiffs' claims were based upon; Plaintiffs' underlying legal claim is based upon the 2018 misrepresentations, and not the later acts.

Plaintiffs' proposed Amended Complaint also provides facts sufficient to infer the inherently self-concealing nature of Columbia's misconduct. By misrepresenting data that it had control and superior knowledge of, much of which has been alleged to not be publicly available, Columbia's conduct was self-concealing. Further, a reasonably prudent person would not—indeed many unreasonably sophisticated and educated people did not—discover Columbia's scheme because of the nature of the data and the insider knowledge required to find it. Even the public versions of any data were so scattered and complicated, no reasonably prudent person could be expected to investigate and find it all. The trial court, then, erred by effectively reading out of New York law the

reasonable-man, objective analysis of diligence required and in relation to discovering the information or claim involved.

Finally, Plaintiffs adequately pled a claim for unjust enrichment under New York law. That claim was not duplicative of Plaintiffs' GBL claims because the unjust enrichment claim involves a different damage calculation—based not on the false price premium paid by all applicants under the GBL theory, but instead based upon the increased number of applicant fees (a subset of the total number of applicants), that Columbia unjustly received as a result of its misconduct or the total amount of the fee paid, as opposed to the price-premium theory found in the proposed amended complaint. The trial court erred in ignoring the new GBL damage theory in relation to the unjust enrichment theory.

## ARGUMENT

## I. Plaintiffs' Proposed Amended Complaint Adequately Alleges Facts Supporting Equitable Tolling Under New York Law.

### A. The Standard for Equitable Tolling Under New York Law

Under New York law, a claim is equitably tolled when the defendant conceals from the plaintiff facts essential for him to make out the cause of action. To establish equitable tolling, plaintiff must allege facts sufficient to show: (1) the defendant took affirmative steps to conceal the act or the conduct at issue is self-concealing; (2) the plaintiff did not discover their cause of action until after the limitations period expired; and (3) plaintiff's ignorance of his claim was not the result of a lack of diligence. *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 192 (S.D.N.Y. 2000); *Vincent v. Money Store*, 304 F.R.D. 446, 458 (S.D.N.Y. 2015)(tolling applies where the "wrong itself was of such a nature as to be self-concealing"). *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004)("Equitable tolling has also been held appropriate where plaintiff was somehow prevented from learning of her cause of action within the statutory period.").

### B. Plaintiffs Adequately Allege Columbia's Annual Misrepresentations to USNWR Were Affirmative Steps That Concealed Their Past Misrepresentations.

Plaintiffs have alleged that each year after Plaintiffs applied to Columbia because it was ranked as a Top 5 school, Columbia actively concealed its former deception by continuing to supply false data to the college ranking services. JA059-61 at ¶¶ 22-32. Each subsequent year's dissemination of false data was an act of concealment, that concealed the reality of the situation at Columbia, and failed to raise an eyebrow among anyone in the nation—including the USNWR. JA062 at ¶¶ 34-36. And despite the Court's finding that Plaintiff did not "provide a factual basis for equitable tolling in the Complaint," they most certainly did allege the dissemination of false data by Columbia to the college rankings service for every year between 2010 and 2022. JA059-61 at ¶¶ 22-32.

The trial court dismissed these clear, affirmative and well-pled acts, though, because it mistakenly believed that the subsequent misrepresentations by Columbia were all "the same act which forms the basis of plaintiffs underlying cause of action." JA129 (citing *Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006)). But that conclusion is wrong—the act that forms the basis of Plaintiffs' underlying

cause of action is Columbia's misrepresentation of its data *in 2018*[1], the year in which Plaintiffs applied to the school and the year in which they believed Columbia was ranked in the Top 5. Subsequent misrepresentations could not be the basis of their claim because *they had not even been made yet.*

Once these acts are correctly distinguished, it is clear that each and every year Columbia submitted false information to USNWR, it cemented its false ranking and took a step to deceive the public and its former applicants about the true nature of the school. Faculty composition, class size, and the like do not drastically change from year to year, *see* JA060-61 at ¶¶ 23-32, and Columbia's false data submissions kept concealing the true nature of the school with every false submission. As a result, prior applicants continued to be misled by Columbia as to whether they had even been injured—that they had been robbed of the opportunity to apply

---

[1] It's possible the trial court was confused by the class action nature of this suit, that required pleading for the entire class each of the annual Columbia misrepresentations. For example, for the named Plaintiffs, Columbia's acts subsequent to 2018 were not the basis of their cause of action, but were the basis for equitable tolling. But for class members who applied to Columbia in 2020, the misrepresentations of 2020 would be the basis for *their* action. *See, e.g.,* JA065-66.

to the reach school in the Top 5 in the country or had overpaid for the chance to be considered by Columbia.

### C. Plaintiffs Adequately Alleged That Columbia's Data Misrepresentations Were Self-Concealing by Nature.

New York recognizes acts as self-concealing when they involve intentional deception that necessarily obscures the truth, or when a scheme depends on concealment to function effectively. *See, e.g., State of N.Y. v. Hendrickson Bro*s., 840 F.2d 1065, 1083 (2d Cir. 1988) (noting that "the passing off of a sham article as one that is genuine is an inherently self-concealing fraud"); *In re Commodity Exch., Inc.,* 213 F. Supp. 3d 631, 676 (S.D.N.Y. 2016). Columbia's conduct, as alleged, satisfies both criteria.

First, Columbia's data manipulation operated as a fundamental misrepresentation of its academic ranking and standing. By representing itself as a top-ranked institution—when the data, if truthfully disclosed, would not support such a position—Columbia engaged in the functional equivalent of "passing off a fake vase as a real antique." *Hendrickson Bros.*, 840 F.2d at 1083. *See* JA105 at ¶ 35. This kind of false presentation was inherently misleading and not apparent to a reasonably prudent person relying on Columbia's public representations.

Second, the allegations demonstrate that Columbia's misrepresentations required secrecy to achieve their intended effect. Columbia's scheme influenced U.S. News & World Report rankings and thereby maintained its high public perception of its academic stature. JA062 at ¶¶ 34-35. If U.S. News or the public had detected Columbia's manipulations, the university's ranking—and its associated reputational and financial benefits—would have been significantly harmed. Id; JA057-58 at¶10, 16-17. Indeed, when the scheme was ultimately uncovered, Columbia dropped from second to eighteenth in the rankings, confirming the critical role that concealment played in its fraudulent strategy. *See* JA059-60 at ¶¶ 19-20, 34-35 and JA067 at ¶ 61.

Moreover, the nature of the information misrepresented in this case reinforces the self-concealing character of Columbia's actions. Key data such as class sizes, faculty qualifications, and instructional spending were not accessible to outsiders, as only Columbia had control over this internal information. *See* JA059-61 ¶¶ 23-32 at 24-25, and JA068-69 at ¶¶ 66-70. Only Columbia could determine the definitions it applied for terms like "full-time faculty" and "terminal degree"—definitions that shaped the data it presented without outside verification. See JA080 ("It is not clear exactly

which faculty are supposed to be counted in this calculation."). Indeed,
even with his insider knowledge, Professor Thaddeus could only
approximate certain details, underscoring how Columbia's control over the
information at issue here insulated its deception from detection:

> Columbia, however, does not issue a Common Data Set. This is
> highly unusual for a university of its stature. Every other Ivy
> League school posts a Common Data Set on its website, as do
> all but eight of the universities among the top 100 in the U.S.
> News rankings. . . . Columbia prepares two Common Data Sets
> for *internal* use . . . however, []"The University does not share
> these." Consequently, *we know no details regarding how
> Columbia's 82.5% figure* [percentage of undergraduate classes
> with under 20 students] *was obtained*.

JA078 (emphasis added). *See also* JA082 (Prof. Thaddeus puzzling
through how Columbia calculates student-to-faculty ratios and
whether Columbia is counting full and part-time faculty in the
numbers).

So while it is true that Professor Thaddeus's report relied in part on
publicly available data, as the trial court noted, see JA130-31, that limited
information was insufficient in isolation to uncover Columbia's
misrepresentations. For example, information regarding specific
graduation rates, instructional spending, and full-time faculty status for
years prior to 2020 were inaccessible, and the Amended Complaint and

Professor Thaddeus's report clarify the existence or content of earlier public records on these metrics. *See, e.g.*, JA086 (2020 graduation rates), JA083-84 (instructional spending), JA081 (full-time faculty information). Given Plaintiffs' claims stem from misrepresentations from 2018, the trial court simply missed the fact that there is no indication in allegations that any 2018 data was publicly available at any time to Plaintiffs or anyone else.

In sum, Columbia's conduct qualifies as self-concealing under well-established standards, justifying the application of equitable tolling. By misrepresenting internally controlled data, Columbia prevented Plaintiffs and the public from reasonably discovering the truth, thereby warranting relief from the statute of limitations based on the unique facts of this case.

### D. Plaintiffs Exercised Reasonable Diligence in Discovering Their Claims.

The plaintiffs acted with appropriate diligence in uncovering the basis for their claims, and any delay in discovery resulted from circumstances beyond their control, not from any lack of effort on their part.

To demonstrate reasonable diligence, a plaintiff need only show that they took steps that a reasonable person would undertake under the circumstances to uncover their injury or its cause. Here, plaintiffs acted promptly upon receiving information that cast doubt on Columbia's rankings. Specifically, plaintiffs relied on the USNWR for years 2019-2022 and continued to believe Columbia was a Top 5 ranked school and had no inkling that it was submitting false information every year. Only when Professor Thaddeus's report became available did plaintiffs discover the true nature of the Columbia's conduct.

The trial court's basis for disallowing Plaintiffs' Amended Complaint rested on the erroneous conclusion that Plaintiffs failed to exercise diligence in pursuing their claims, on the grounds that it was not "impossible" for them to discover Columbia's misrepresentations before 2021, when the statute of limitations had expired. JA130-31 (citing *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20 (2d Cir. 1985); *Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002)). However, this analysis mistakenly relied on an absolute concept of "impossibility" rather than the "reasonable person" standard required by New York law.

The court's interpretation of "impossible" as an absolute threshold disregards the standard set forth in *Miller* and *Pearl*, which asks whether it would have been "impossible for a *reasonably prudent person*" to have discovered the cause of action. *Miller*, 755 F.2d at 24; *Pearl*, 296 F.3d at 85 (emphasis added). This language makes clear that the proper analysis considers what a reasonably prudent person would have done under the circumstances, not whether discovery was categorically impossible. Reading the term "impossible" as absolute would render the reasonable-person inquiry meaningless.

Further, the facts of this case contrast sharply with those in *Miller* and *Pearl*. In *Miller*, the plaintiff was aware of his discharge and the discriminatory treatment that led to it but failed to file a claim within the statutory period, despite being an experienced lawyer who knew of his rights. 755 F.2d at 24-25. Similarly, in *Pearl*, the plaintiff sought to toll the statute of limitations *for more than 30 years*, based on an officer's eventual admission of civil rights violations that the plaintiff already suspected at the time of the original suit. *Pearl*, 296 F.3d at 87. Both cases involved plaintiffs aware of specific facts underlying their claims and who failed to act within the statute of limitations. By contrast, Plaintiffs did not know or

suspect that Columbia inflated its ranking until Professor Thaddeus published his report in March 2022. Unlike the plaintiffs in *Miller* and *Pearl*, Plaintiffs were not aware of any specific acts or injury caused by Columbia.

Indeed, as the complaint details, Columbia's misrepresentations went undetected by numerous knowledgeable parties, including (1) tens of thousands of applicants and their families, JA069 at ¶ 72; (2) competing institutions in higher education, JA070 at ¶ 73; and (3) USNWR itself, JA069 at ¶ 71. The fact that no other interested parties uncovered Columbia's manipulation over a decade demonstrates that, under an *objective* standard, a reasonably prudent person would not have detected this wrongdoing sooner. JA062 at ¶ 34. *See Sec. & Exch. Comm'n v. Rashid*, 96 F.4th 233, 242 (2d Cir. 2024); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023)("reasonably prudent person" standard is inherently objective).

To hold otherwise, and so find that high school students and their parents who apply to universities need to fact check USNWR and every other college ranking service, sifting through obscure government documents and turning over every rock in the hope of discovering some internal data on a college's student-to-faculty ratio, faculty composition, educational funding, etc. would be absurd. Reasonable prudence requires

27

only a level of investigation proportionate to the information available at the time. In this instance, the raw data at issue was not readily available, was not easily interpretable and required specialized knowledge and tools to convert it into evidence of Columbia's misconduct.

For example, to ascertain that Columbia had misstated class sizes, a person would have needed specialized knowledge about the existence of the Directory of Classes and its inclusion of detailed enrollment information. JA078-80. Furthermore, one would have had to understand how to use the Internet Archive to access previous editions of the Directory, as Columbia periodically removes this information from its website. JA079. Even if someone were able to access the archived directories, additional expertise would be necessary to distinguish between undergraduate and graduate classes. *Id*. And this is merely one of seventeen factors in the USNWR ranking methodology. Each of these elements required extensive analysis beyond what could reasonably be expected from a diligent applicant or parent. The reasonable person standard does not envision such an exhaustive investigation.

Thus, the plaintiffs demonstrated ample factual basis to show that a reasonable person would not have discovered Columbia's

misrepresentations through normal diligence. Discovering Columbia's actual class sizes, or internal definitions for academic metrics, would have required extraordinary efforts and resources—well beyond the reasonable expectations of an ordinary applicant. The trial court's interpretation improperly disregards the reasonable-person requirement, which New York law upholds as essential to the diligence inquiry in equitable tolling cases.

### E. Plaintiffs Filed Their Claim Within a Reasonable Time After the Discovery of Their Claim.

The trial court also erred in finding that Plaintiffs lacked diligence, even if tolling applied.  This determination overlooks both the purpose of equitable tolling and the specific timeline of events.

Plaintiffs' claims accrued when they paid their application fee in the Fall of 2018. *See* JA134. However, tolling suspends the running of the limitations period after accrual. As this Court has explained, "[o]nce a claim accrues, the limitations period may stop running due to tolling." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 87 n.5 (2d Cir. 2024) (emphasis in original) (citing *Valdez ex rel. Donely v. United States*, 518 F.3d

173, 185 (2d Cir. 2008) ("Tolling doctrines stop the statute of limitations from running even if the accrual date has passed.")).

When equitable tolling applies, "the limitations period is deemed interrupted; when the tolling condition or event has ended, the claimant is allowed the remainder of the limitations period in which to file his action." *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir. 1999); *see also Alli-Balogun v. United States*, 281 F.3d 362, 368 (2d Cir. 2002). That is, equitable tolling effectively "restarts the limitations clock where it was stopped by equity." *Harper v. Ercole*, 648 F.3d 132, 141-42 (2d Cir. 2011). Thus, where a limitations period is tolled, the claimant should be afforded the remaining time on the clock without the need to establish further diligence, so long as they file within that period.

Here, the statute was tolled from the date Plaintiffs paid their application fee until the publication of the Thaddeus report in March 2022, restarting the limitations clock with three years remaining. Plaintiffs filed within 11 months after the publication of the Thaddeus report and only a few months after Columbia publicly admitted it had inflated its ranking. Alternatively, tolling began in 2019 when USNWR published the subsequent undergraduate rankings, including Columbia's concealment of

its prior data misrepresentations.  That, though, would only remove one year from the three-year clock. In either alternative, Plaintiffs filed well within the tolled statute of limitations.

The trial court's reliance on *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007), does not alter this outcome. *Abbas* involved a § 1983 claim by a prisoner who was aware of his injury and its source but failed to file within the limitations period, citing personal confusion and confinement as reasons for delay. 480 F.3d at 638, 641-42. Unlike the plaintiff in *Abbas*, Plaintiffs here were not aware of their injury, nor could they have reasonably discovered it, until after the limitations period had expired.

## II.  Plaintiff's Unjust Enrichment Claim Was Not Futile Because Its Damage Theory is Not Identical to the GBL Claims.

The plaintiff has adequately pled an alternative theory of recovery under New York common law for unjust enrichment. New York courts recognize an unjust enrichment claim where (1) the defendant has been enriched, (2) at the expense of the plaintiff, and (3) it would be inequitable to allow the defendant to retain that benefit. *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 5124 (S.D.N.Y. 2015). The Plaintiff's proposed amended

complaint here clearly satisfies each element: it alleges that Columbia

University was enriched by receiving an influx of applications due to a

false ranking due to inaccurate data provided to third-party ranking

services like U.S. News & World Report. JA058 at ¶¶ 15-16. But for

Columbia's inflated ranking, Plaintiffs would not have applied and paid

the application fees, resulting in a $85 per applicant loss. JA065 at ¶ 49. The

complaint further details how Columbia knowingly submitted the incorrect

data, understanding that a higher ranking would lead to increased

applications and unwarranted fee revenue, a situation plainly inequitable

for Columbia to retain. JA058 at ¶¶ 14-20.

The trial court, however, found the unjust enrichment claim futile on

the grounds that it relied on in its dismissal order: that the unjust

enrichment claim had "the same factual allegations underlying their GBL

claims and sought the same damages." JA124. However, the trial court

ignored that the Amended Complaint sets plainly sets out facts that

support separate damage theories for the GBL claims and the unjust

enrichment claim. Specifically, the Amended Complaint delineates

damages for the GBL violations as the price premium for each Columbia

application—the price premium between what a Top 5 school can charge

for an application fee and what a lower ranked school can. JA072-73 at ¶ 94 and ¶ 104. In contrast, one need only compare the trial court's own opinion on the motion to dismiss and the motion to vacate and amend its judgment on that motion regarding what Plaintiffs' unjust enrichment damage theory was: the unjust enrichment count seeks either the total $85 paid for each applicant or the disgorgement of the aggregate application fee income generated by Columbia and held by it ($85 times the number of increased applicants due to their inequitable and misleading conduct). JA047-49; JA124.

Since these damage theories yield different damage amounts, the unjust enrichment claim is not duplicative and therefore, at the very least, the trial court should have allowed the Amended Complaint on the basis of a valid unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs request this Court reverse the trial court's Order of August 20, 2024, regarding its proposed amended complaint, require the filing of same, or in the alternative, an order allowing Plaintiffs to amend consistent with this Court's ruling.

Respectfully submitted,

*/s Matthew T. Hurst*
Matthew T. Heffner
Matthew T. Hurst
Heffner Hurst
*Counsel for Plaintiffs-Appellants*
30 N. LaSalle Street, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,402 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Book Antiqua.

*/s Matthew T. Hurst*

Dated: November 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2024, I electronically filed the foregoing brief and the Joint Appendix with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. Counsel for Defendant-Appellee in this case are registered ACMS users, and service will be accomplished by the appellate ACMS system.

*/s Matthew T. Hurst*

Dated: November 8, 2024